Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
1801 Century Park East, 24th Floor
Los Angeles, CA 90067
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ES TRUST, Derivatively on Behalf of GROCERY OUTLET HOLDING CORP., | Civil Action No. __________ |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JASON POTTER, CHRISTOPHER M. MILLER, JOHN E. BACHMAN, MARY KAY HABEN, CAREY F. JAROS, MICHAEL K. KOBAYASHI, ERIC J. LINDBERG, JR., LAWRENCE P. MOLLOY, GAIL MOODY-BYRD, ERIK D. RAGATZ, and JEFFREY R. YORK, | |
| Defendants, | |
| and | |
| GROCERY OUTLET HOLDING CORP., | |
| Nominal Defendant. | |

Plaintiff ES Trust ("Plaintiff"), by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company"), against its President and Chief Executive Officer ("CEO"), its Executive Vice President and Chief Financial Officer ("CFO"), and the members of its Board of Directors (the "Board") (collectively, the "Individual Defendants") for their breaches of fiduciary duties and

violations of the federal securities laws. Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief, based upon the investigation of and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action filed against the Company and certain of its officers, *Jones v. Grocery Outlet Holding Corp., et al.*, No. 4:26-cv-02291-AMO (N.D. Cal.) (the "Securities Class Action"), transcripts of the Company's earnings conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought against certain of the Company's directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to the Company and its stockholders.

2. Grocery Outlet is a growth-oriented extreme value retailer of quality, name-brand consumables and fresh products sold primarily through a network of independently operated stores ("IOs"). As of January 3, 2026, the Company operated 570 stores in sixteen states. The Company derives substantially all of its net sales from retail sales at these stores and its fiscal 2025 net sales of $4.69 billion were overwhelmingly dependent on the performance and continued expansion of its store base. Approximately 9% of the Company's net sales in fiscal 2025 were in the form of Electronic Benefits Transfer payments associated with the federal Supplemental Nutrition Assistance Program.

3. Beginning on August 5, 2025, Grocery Outlet repeatedly touted the success of a restructuring plan it had initiated in the fourth quarter of fiscal 2024 (the "Restructuring Plan"), represented the Restructuring Plan as having been "substantially completed in the second quarter

of fiscal 2025," and emphasized new store growth as a central driver of revenue and of the Company's ability to meet its publicly issued financial guidance. In reality, as the Individual Defendants knew or recklessly disregarded, the Company had expanded too quickly into new stores; the Company's purportedly strong financial and operational growth was being artificially supported by excessive, rapid store expansion that was not sustainable; the Restructuring Plan was inadequate to achieve its operational goals and would require further optimization, including significant store closures and material non-cash asset impairment charges; and the Company was unable to achieve the sustainable growth required to meet its publicly issued fiscal 2025 guidance.

4. Despite this knowledge, the Individual Defendants failed to implement and maintain an effective system of internal controls over financial reporting and public disclosures. The Individual Defendants either made or permitted the issuance of materially false and misleading statements that overstated the health of Grocery Outlet's core operations, understated the risks posed by the Company's rapid new store expansion, and misrepresented the Company's ability to meet its issued financial guidance.

5. On August 5, 2025, the Company reported that second quarter fiscal 2025 net sales increased 4.5% to $1.18 billion "due to new store sales and a 1.1% increase in comparable store sales," that the Company had "opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states," and that "[t]he actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025." The Company simultaneously **raised** its fiscal 2025 adjusted diluted earnings per share guidance to $0.75 to $0.80 from the previously announced $0.70 to $0.75 range.

6. During the Q2 fiscal 2025 earnings call held later that afternoon, Grocery Outlet's CEO, Defendant Jason Potter ("Potter") represented that the Company was "taking deliberate steps to improve performance" across its store base, including rebalancing store growth toward a healthier mix of core versus new markets, adjusting its internal returns framework, developing more robust site selection criteria, and testing several key commercial pilots. Potter further

represented that, as a result of the Company's disciplined underwriting standards and focused execution, returns were expected to improve steadily.

7. The Company's CFO, Defendant Christopher M. Miller ("Miller") reinforced these false assurances by representing that the Company was "affirming our outlook for the year except for adjusted EPS, which we are increasing due primarily to favorable interest expense."

8. On November 4, 2025, the Company reported that third quarter fiscal 2025 net sales increased 5.4% to $1.17 billion "due to new store sales and a 1.2% increase in comparable store sales," and that the Company had "opened 13 new stores and closed two stores, ending the quarter with 563 stores in 16 states." On the corresponding earnings call, Defendant Potter represented that the Company "continue[d] to advance our strategy while executing to deliver strong bottom-line results" and had "added 11 net new stores" in the third quarter.

9. On March 4, 2026, Grocery Outlet reported its financial results for the fourth quarter and full fiscal year 2025. The Company's full-year results missed guidance on nearly every major financial metric, including adjusted EBITDA of $254.3 million (missing prior guidance of $258 million at the low end); net sales of $4.69 billion (missing prior guidance of $4.70 billion at the low end); comparable store sales growth of only 0.5% on a 52-week basis (missing prior guidance of 0.6% to 0.9%); and adjusted diluted earnings per share of $0.76 (missing prior guidance of $0.78 at the low end). Moreover, the Company disclosed it was implementing a new "Optimization Plan" on top of the already-announced Restructuring Plan, "reshaping [its] new store growth strategy," and closing 36 financially underperforming stores — including 24 stores in the East, representing roughly 30% of that region's fleet. The Company further disclosed $113.8 million of non-cash impairment charges relating to long-lived assets, $149.0 million of non-cash goodwill impairment, a fiscal 2025 operating loss of $221.7 million, and a net loss of $224.9 million, or $(2.30) per diluted share.

10. On the same date, Grocery Outlet held a conference call with financial analysts and investors during which Defendant Potter effectively conceded the falsity of the prior statements, stating:

> Following a rigorous analysis of the fleet, we identified 36 stores in the network that we concluded did not have a viable path to sustained profitability regardless of the operational support we could provide. We've made the difficult decision to close 36 locations, 24 of which are located in the East, representing roughly 30% of that region's fleet. . . . However, it's clear now that we expanded too quickly, and these closures are a direct correction.

11. Following the March 4, 2026 corrective disclosures, Grocery Outlet's common stock price fell more than 27%. Following this steep stock drop, on March 16, 2026, the Securities Class Action was filed in this Court against the Company, Defendant Potter, and Defendant Miller, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder exposing Grocery Outlet to substantial defense costs and potential judgments or settlements payable, to the extent not covered by insurance, from the Company's own coffers.

12. Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The Director Defendants (defined below) are neither disinterested nor independent. Absent this action, Grocery Outlet will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures that permitted the wrongdoing alleged herein.

## II. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This Court has jurisdiction over each Defendant named herein because Grocery Outlet maintains its principal executive offices in this District at 5650 Hollis Street, Emeryville, California 94608, and each of the Individual Defendants has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Grocery Outlet's principal executive offices are located in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## III. THE PARTIES

### A. Plaintiff

17. Plaintiff ES Trust purchased Grocery Outlet stock in November 2025, has continuously held Grocery Outlet shares at all relevant times, and thus was a stockholder at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of Grocery Outlet in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B. Nominal Defendant

18. Nominal Defendant Grocery Outlet Holding Corp. is a Delaware corporation with its principal executive offices located at 5650 Hollis Street, Emeryville, California 94608. Grocery Outlet was incorporated in Delaware on September 11, 2014. The Company completed its initial public offering in June 2019, and its common stock has traded on the Nasdaq Global Select Market ("Nasdaq") under the symbol "GO" since June 20, 2019. As of February 26, 2026, Grocery Outlet had 98,153,086 shares of common stock outstanding.

### C. Officer Defendants

19. Defendant **Potter** has served as Grocery Outlet's President and CEO and as a director since February 3, 2025. Potter is not an independent director. Potter is a named defendant in the Securities Class Action. Potter signed, in his capacity as CEO, the Company's Quarterly Reports on Form 10-Q for the second and third quarters of fiscal 2025 filed with the SEC on August 5, 2025 and November 4, 2025, respectively, and certified the accuracy of those reports pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ( "SOX"). From 2020 through

January 2025, Potter served as CEO and director of The Fresh Market, Inc. ("Fresh Market") and prior to that served in successively senior positions at Sobeys Inc. ("Sobeys"), the Canadian food and drug retailer, from 1990 through June 2018, including most recently as Executive Vice President of Operations. In fiscal year 2025, Potter received the following compensation from Grocery Outlet:

| Year | Salary ($) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($)[1] |
|---|---|---|---|---|---|
| 2025 | 925,539 | 4,100, 005 | 3,363,334 | 625,976 | 9,501,919 |

20. Defendant **Miller** has served as Grocery Outlet's Executive Vice President and CFO since January 6, 2025. Miller is a named defendant in the Securities Class Action. Miller signed, in his capacity as CFO, the Company's Quarterly Reports on Form 10-Q for the second and third quarters of fiscal 2025 filed with the SEC on August 5, 2025 and November 4, 2025, respectively, and certified the accuracy of those reports pursuant to Sections 302 and 906 of SOX. In fiscal year 2025, Miller received the following compensation from Grocery Outlet:

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Total ($)[2] |
|---|---|---|---|---|---|
| 2025 | 538,140 | 100,000 (signing) | 950,015 | 550,005 | 2,345,544 |

21. Defendants Potter and Miller are collectively referred to herein as the "Officer Defendants."

**D. Director Defendants**

22. Defendant **John E. Bachman** ("Bachman") has served as a director of Grocery Outlet since November 2019 and is Chair of the Audit and Risk Committee (the "Audit Committee"). Bachman concurrently serves on the Board of Directors of GOJO Industries, Inc.

[1] Includes $487,065 in non-equity incentive plan compensation.

[2] Includes $135,934 in non-equity incentive plan compensation and $71,450 in other compensation.

("GOJO"), a private Ohio-based consumer products company. Since fiscal year 2022, Bachman received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 100,000 | 125,061 | 225,061 |
| 2023 | 100,000 | 163,027 | 263,027 |
| 2024 | 100,000 | 150,006 | 250,006 |
| 2025 | 101,957 | 150,009 | 251,966 |

23. Defendant **Mary Kay Haben** ("Haben") has served as a director of Grocery Outlet since November 2019 and is Chair of the Nominating and Corporate Governance Committee. Since fiscal year 2022, Haben received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 83,750 | 125,061 | 208,811 |
| 2023 | 93,778 | 163,027 | 256,805 |
| 2024 | 95,000 | 150,006 | 245,006 |
| 2025 | 98,995 | 150,009 | 249,004 |

24. Defendant **Carey F. Jaros** ("Jaros") has served as a director of Grocery Outlet since September 2020. During fiscal year 2024 and through August 7, 2025, Jaros was a member of the Compensation Committee. Following the retirement of former director Kenneth W. Alterman on August 7, 2025, Jaros became Chair of the Compensation Committee. Jaros has served as President and CEO of GOJO since January 2020. Since fiscal year 2022, Jaros received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 87,758 | 125,061 | 212,819 |
| 2023 | 85,000 | 163,027 | 248,027 |
| 2024 | 85,000 | 150,006 | 235,006 |
| 2025 | 90,992 | 150,009 | 241,001 |

25. Defendant **Michael K. Kobayashi** ("Kobayashi") has served as a director of Grocery Outlet since June 26, 2025 and is a member of the Audit Committee. In fiscal year 2025, Kobayashi received the following compensation from Grocery Outlet:

| **Year** | **Fees Earned or Paid in Cash ($)** | **Stock Awards ($)** | **Total ($)** |
|---|---|---|---|
| 2025 | 46,236 | 150,000 | 196,236 |

26. Defendant **Eric J. Lindberg, Jr.** ("Lindberg") has served as a director of Grocery Outlet since 2006 and as Chairman of the Board since January 2023. Lindberg previously served as the Company's CEO from January 2019 through December 2022, as Co-CEO from January 2006 through December 2018, and as Interim President and CEO from October 29, 2024 through February 2, 2025. Lindberg is the son-in-law of the Company's former CEO Peter Read and is a member of the Read family, which founded the Company's predecessor in 1946 and has controlled the Company through three generations of leadership. In fiscal years 2024 and 2025, Lindberg received the following compensation from Grocery Outlet:

| **Year** | **Salary ($)** | **Bonus ($)** | **Stock Awards ($)** | **All Other Compensation ($)** | **Total ($)** |
|---|---|---|---|---|---|
| 2024 | 159,203 | — | 4,254,398 | 348,486 | 4,762,087 |
| 2025 | 92,183 | — | 150,009 | 633,906 | 876,098 |

27. During fiscal year 2023 (when Lindberg served as Chairman of the Board but not as an executive officer), Lindberg received director compensation totaling $388,027, consisting of $225,000 in cash retainers and $163,027 in stock awards. As reported in the 2023 Proxy Statement Summary Compensation Table, during fiscal year 2022 (when Lindberg served as Chief Executive Officer), Lindberg received compensation totaling $5,330,287 from the Company.

28. Defendant **Lawrence P. Molloy** ("Molloy") has served as a director of Grocery Outlet since June 26, 2025 and is a member of the Audit Committee. In fiscal year 2025, Molloy received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2025 | 46,236 | 150,000 | 196,236 |

29. Defendant **Gail Moody-Byrd** ("Moody-Byrd") has served as a director of Grocery Outlet since January 2021 and is a member of the Audit Committee. Since fiscal year 2022, Moody-Byrd received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 90,000 | 125,061 | 215,061 |
| 2023 | 90,000 | 163,027 | 253,027 |
| 2024 | 90,000 | 150,006 | 240,006 |
| 2025 | 88,003 | 150,009 | 238,012 |

30. Defendant **Erik D. Ragatz** ("Ragatz") has served as a director of Grocery Outlet since October 2014 and as Lead Independent Director since January 2023. Ragatz is a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. Ragatz has served as a Senior Advisor at Hellman & Friedman LLC ("H&F"), a private equity firm, since February 2023, and previously served as a Partner of H&F from 2008 through early 2023, leading H&F's efforts to invest in the consumer, retail, and industrial sectors. In 2014, an investment fund affiliated with H&F (the "H&F Investor") acquired Grocery Outlet from Berkshire Partners LLC, and Ragatz has continuously held his seat on the Board as a representative of the H&F Investor since that transaction. Ragatz concurrently serves as Chairman of the Board of At Home Group, Inc. (an H&F portfolio home décor retailer), Chairman of the Board of The New Leaf Company BV (d/b/a Superplum, an H&F portfolio fresh produce supply company whose product offering overlaps with Grocery Outlet's fresh products segment), and a director of And Go Concepts, LLC (d/b/a Salad&GO). From August 2017 to June 2024, Ragatz served as Chairman of Snap One Holdings Corp., another H&F portfolio company. Ragatz served as Grocery Outlet's Chairman of the Board from October 2014 through December 2022. Since fiscal year 2022, Ragatz received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 100,000 | 125,061 | 225,061 |
| 2023 | 146,222 | 163,027 | 309,249 |
| 2024 | 145,000 | 150,006 | 295,006 |
| 2025 | 140,000 | 150,009 | 295,009 |

31. Defendant **Jeffrey R. York** ("York") has served as a director of Grocery Outlet since November 2010 — the longest continuous tenure of any non-Read-family director — and is a member of the Audit Committee. From June 2020 through January 2025, York served as Special Advisor to Sobeys, the Canadian food and drug retailer where Defendant Potter held successively senior operational and leadership roles from 1990 through June 2018; York's Sobeys advisory tenure ended the same month Potter was appointed CEO of Grocery Outlet. From November 2009 through June 2020, York served as Co-Chief Executive Officer and President of Farm Boy, Inc., a Canadian specialty grocery retailer that was acquired in 2018 for approximately $800 million by Sobeys' parent company Empire Company Limited. Since fiscal year 2022, York received the following compensation from Grocery Outlet:

| Year | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Total ($) |
|---|---|---|---|
| 2022 | 87,242 | 125,061 | 212,303 |
| 2023 | 90,000 | 163,027 | 253,027 |
| 2024 | 90,000 | 150,006 | 240,006 |
| 2025 | 90,000 | 150,009 | 240,009 |

32. Defendants Potter, Miller, Bachman, Haben, Jaros, Kobayashi, Lindberg, Molloy, Moody-Byrd, Ragatz, and York are collectively referred to herein as the "Individual Defendants." Defendants Bachman, Haben, Jaros, Kobayashi, Lindberg, Molloy, Moody-Byrd, Potter, Ragatz, and York are collectively referred to herein as the "Director Defendants."

**E. Non-Party Directors**

33. Non-parties **Frances L. Allen** and **Felicia D. Thornton** were appointed as independent directors of Grocery Outlet effective April 1, 2026, following the corrective

disclosure on March 4, 2026. Allen and Thornton are not named as defendants. Non-parties **Kenneth W. Alterman** and **Thomas F. Herman** authorized the 2025 Proxy Statement (filed April 17, 2025) but retired from the Board effective August 7, 2025 and therefore played no material role in the subsequent misconduct. Consequently, Alterman and Herman are not named as defendants in this action.

## IV. THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

34. By reason of their positions as officers and/or directors of Grocery Outlet, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Grocery Outlet and its stockholders fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Grocery Outlet in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Grocery Outlet and its stockholders to benefit all stockholders equally and not in furtherance of their own personal interests or benefit.

35. The Individual Defendants, because of their positions of control and authority as directors and officers of Grocery Outlet, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36. As officers and directors of a publicly traded company whose common stock was registered with the SEC and trades on the Nasdaq, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Grocery Outlet's financial condition, operations, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Grocery Outlet's management, policies, and internal controls.

37. At all times relevant hereto, the Individual Defendants were the agents of each other and of Grocery Outlet and were always acting within the course and scope of such agency.

38. The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Grocery Outlet.

**A. Duties Under Grocery Outlet's Code of Business Conduct and Ethics**

39. Grocery Outlet maintains a Code of Business Conduct and Ethics (the "Code of Conduct") that applies to every Grocery Outlet officer, director, and employee. The Code of Conduct sets forth foundational ethical obligations:

> Integrity and adherence to the highest ethical standards are critical to the Company's reputation and success. Our reputation needs to be managed and developed in carrying out the business of the Company, including with investors, developers, dealers, suppliers, independent operators, vendors, strategic partners, customers, regulatory officials, community leaders, the press, landlords, the general public, fellow employees and other third parties. It is essential that all of your dealings be legal, above reproach, consistent with the Company's policies and aligned with the highest standards of business ethics.

40. The Code of Conduct provides that employees who violate the Code are subject to the following consequences:

> If the Audit and Risk Committee or its designee determines that this Code has been violated, either directly, by failure to report a violation, or by withholding information related to a violation, the offender may be disciplined for noncompliance with penalties up to and including removal from office or dismissal. Such penalties may include written notices to the individual involved that a violation has been determined, a written letter of reprimand by the Audit and Risk Committee, disgorgement, demotion or re-assignment of the individual involved, suspension with or without pay or benefits and termination of employment. Violations of this Code may also constitute violations of law and may result in criminal penalties and civil liabilities for the offending person and the Company. You are expected to cooperate in all internal investigations of misconduct, as well as internal, government and regulatory inquiries, audits and inspections.

41. Under the subsection entitled "Accuracy of the Company's Records," the Code of Conduct provides:

> All official records reflecting the performance (financial or otherwise) and conduct of the Company's business must be accurate and complete in all material respects. All those involved in the preparation of such materials should consider the accuracy of the records of critical importance, and should understand that the Company does not maintain, nor does it tolerate, any off-the-books funds or transactions for any

> purposes unless in accordance with applicable accounting regulations. It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, regulations and rules. All books and records of the Company shall be kept in such a way as to fully and fairly reflect all Company transactions in accordance with generally accepted accounting principles.
>
> As a public company, the Company adheres to the requirements of the U.S. securities laws and The NASDAQ Stock Market LLC. The Company is required by law to file certain reports and make certain disclosures. All Company personnel should take steps to ensure full, fair, accurate, timely and understandable disclosure in all reports and documents filed with the Securities and Exchange Commission (the "SEC") or any other governmental or regulatory agency and in other public communications made by the Company.

42. Under the subsection entitled "Business Conduct," the Code of Conduct further states:

> You should be aware of the ethical practices of each person that you directly oversee or manage. We must maintain an attitude within the Company that unethical actions or the appearance of unethical actions are not acceptable, even though they may seem to be standard business practices in other companies. You must engage in and promote honest and ethical conduct.

43. Under the subsection entitled "Insider Trading," the Code of Conduct also provides:

> Trading in the stock or securities of a company (including any suppliers, partners, vendors or customers or others related to the Company and their respective affiliates and businesses) by a person who is aware of material, non-public information about that company is considered "insider trading." Information is "material" if a reasonable investor would consider such information important in a decision to buy, hold or sell the securities. Information is non-public until it has been broadly disclosed to the marketplace and the marketplace has had time to absorb the information. Examples of adequate disclosure methods include public filings with the SEC and the issuance of broadly distributed press releases. Insider trading and the sharing of material, non-public information with any other person who then trades in securities or passes the information to others (called "tipping") is illegal. The personal consequences of insider trading or tipping can be severe and include possible imprisonment and significant fines. Individuals who involve themselves in insider trading or tipping may be subject to immediate termination.

44. In violation of the Code of Conduct, the Individual Defendants (as key officers of the Company and/or members of the Board) failed to prevent the Company from issuing materially false and misleading statements to stockholders, facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duties, waste, and unjust enrichment. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with applicable laws and regulations.

**B. Additional Duties Of Audit Committee Members**

45. The Company's Amended and Restated Audit and Risk Committee Charter (the "Audit Committee Charter") provides that the Audit Committee shall, among other things, provide assistance to the Board with respect to its oversight of: (i) "[t]he quality and integrity of the Company's financial statements, including the oversight of the Company's accounting and financial reporting processes"; (ii) "[t]he Company's compliance with legal and regulatory requirements related to financial reporting and internal controls"; (iii) "[t]he independent registered public accounting firm's retention, fees, qualifications, planned audit procedures, performance and independence"; (iv) "[t]he Company's corporate compliance program, including the Company's Code of Business Conduct and Ethics, and investigating or overseeing investigations of possible violations thereunder"; (v) "[t]he risk management policies and procedures of the Company"; and (vi) "[t]he performance of the Company's internal audit function."

46. The Audit Committee Charter further imposes specific and non-delegable duties on the members of the Audit Committee. The Audit Committee Charter provides that the Audit Committee shall:

- Review and discuss with management and the independent registered public accounting firm, prior to public dissemination, the Company's annual audited financial statements and quarterly unaudited financial statements and related notes, the reports of the independent registered public accounting firm on the annual audited financial statements and internal control over financial reporting, and the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's SEC filings.

- Discuss with the independent registered public accounting firm the matters required to be discussed by the applicable auditing standards adopted by the PCAOB and approved by the SEC from time to time.

- Review and discuss with management and, if appropriate, the independent registered public accounting firm the Company's earnings press releases (including non-GAAP financial measures), as well as financial information and earnings guidance provided to stockholders, analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each

earnings release or each instance in which the Company may provide financial information and earnings guidance.

- Review and discuss with management and the independent registered public accounting firm any significant issues (including any significant deficiencies or material weaknesses) arising as to the adequacy or effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures (including management's reports thereon), any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

47. The Audit Committee Charter further provides. that the Audit Committee shall:

- In consultation with the independent registered public accounting firm, management and the internal auditors, review the integrity of the Company's financial reporting processes. In furtherance thereof, the Committee must obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding: (i) all critical accounting policies and practices to be used by the Company; (ii) critical audit matters as determined by the independent registered public accounting firm; (iii) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm; (iv) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and (v) any other material written communications between the independent registered public accounting firm and the Company's management such as any management letter or schedule of unadjusted differences.

- Review the annual enterprise risk management assessment, which considers strategic, operational, compliance and financial risks across the organization, with management, the leader of the internal audit function, and, as necessary, the independent registered public accounting firm; such review shall include oversight of the framework, quality and effectiveness of the enterprise risk management process, the Company's policies for monitoring, assessment, prioritization and management of risks, and the steps management has taken to monitor and mitigate such risks.

- As part of the Company's enterprise risk management process, oversee certain identified risks relating to financial risks (including liquidity, legal, regulatory and other contingencies), data security, privacy and cybersecurity risks, and other risks identified (but not assigned to the Board of Directors or another committee thereof), in each case that are assigned to a member of senior management and such person's development of a risk mitigation plan that is tracked to completion.

- Review and discuss with management the Company's corporate compliance program, including its Code of Business Conduct and Ethics and any procedures for monitoring compliance with the program, as well as any material inquiries received from regulators or government agencies.

- Investigate or oversee the investigation undertaken by or on behalf of the Company regarding the possible violations of the Company's corporate compliance program and report the results and recommendations to the Board of Directors.

- Oversee, review and periodically update the Company's Code of Business Conduct and Ethics (including review of requests of waivers thereof by executive officers and directors) and oversee the Company's system to monitor compliance with and enforce such Code of Business Conduct and Ethics.

- Oversee the Company's Related Person Transaction Policy and in accordance with such policy, review and, if deemed appropriate, approve any transaction between the Company and a Related Person that would be required to be disclosed pursuant to Item 404(a) of Regulation S-K of the Exchange Act. "Related Person" shall have the meaning given to such term in Item 404(a) of Regulation S-K.

48. In violation of the Audit Committee Charter, the members of the Audit Committee — Defendants Bachman (Chair), Kobayashi, Molloy, Moody-Byrd, and York — allowed the Company to issue materially false and misleading statements and disclosures to stockholders, facilitated and disguised the Individual Defendants' violations of law including breaches of fiduciary duty, waste, and unjust enrichment, and failed to implement adequate risk assessment and risk management protocols to ensure the Company's compliance with applicable laws and regulations. Notwithstanding their non-delegable duty under ¶1 of the Audit Committee Charter to review and discuss with management the Company's quarterly unaudited financial statements "prior to public dissemination," these defendants failed to prevent the issuance of the materially false and misleading Q2 FY2025 10-Q (filed August 6, 2025) and Q3 FY2025 10-Q (filed November 5, 2025), and their respective MD&A disclosures. Notwithstanding their non-delegable duty under ¶3 of the Audit Committee Charter to review and discuss with management the Company's "earnings press releases (including non-GAAP financial measures), as well as financial information and earnings guidance provided to stockholders, analysts and rating agencies," these Director Defendants failed to prevent the issuance of the materially false and

misleading Q2 and Q3 FY2025 earnings press releases and affirmation and raising of fiscal 2025 financial guidance.

**C. Additional Duties Of Compensation Committee Members**

49. The Company's Amended and Restated Compensation Committee Charter (the "Compensation Committee Charter") imposes additional duties on the members of the Compensation Committee, including Defendants Jaros (who became Chair on August 7, 2025 upon the retirement of non-party former director Kenneth W. Alterman) and Ragatz.

50. Among other things, the Compensation Committee Charter provides that the Compensation Committee shall:

- Review and approve, or recommend to the Board of Directors, the annual target compensation of the Executive Officers, other than the Chief Executive Officer, including the annual salary, bonus, equity and equity-based incentives and other direct and indirect benefits . . . .

- Review and approve performance goals and objectives relevant to the compensation of the Executive Officers, other than the Chief Executive Officer. Review and evaluate the performance of the Executive Officers relative to such goals and objectives as well as compensation programs of the Company.

- Support the independent members of the Board, as appropriate, when determining and approving annual salary, bonus, and grant value of equity and equity-based incentives and other direct and indirect benefits . . . for the Chief Executive Officer.

- Consider, on at least an annual basis, management's assessment of whether risks arising from the Company's compensation policies and practices for all employees, including non-Executive Officers, are reasonably likely to have a material adverse effect on the Company . . . .

51. In violation of the Compensation Committee Charter, Defendants Jaros and Ragatz awarded (or recommended to the Board that the Board award) substantial executive compensation to Defendants Potter, Miller, and other executive officers while the misconduct alleged was ongoing, and failed to appropriately assess whether the Company's compensation policies and practices — which rewarded unsustainable near-term new-store growth — were reasonably likely to have a material adverse effect on the Company.

**D. Additional Duties Of Nominating And Corporate Governance Committee Members**

52. The Company's Amended and Restated Nominating and Corporate Governance Committee Charter (the "Nominating and Corporate Governance Committee Charter") imposes additional duties on the members of the Nominating and Corporate Governance Committee, including Defendants Haben (Chair) and Ragatz.

53. The Nominating and Corporate Governance Committee Charter provides that the Nominating and Corporate Governance Committee shall provide assistance to the Board by, among other things:

- Identifying individuals qualified to become directors, consistent with the criteria approved by the Board of Directors in the Corporate Governance Guidelines and otherwise, recommending the director nominees to the Board of Directors for election at a meeting of stockholders, and recommending persons to the Board of Directors to fill vacancies or newly created directorships that may occur between such meetings.
- Developing and recommending to the Board of Directors a set of corporate governance principles and policies applicable to the Company.
- Overseeing the evaluation of the Board of Directors and committees of the Board of Directors.
- Overseeing matters of environmental, social and governance initiatives and reporting of the Company.
- Leading and shaping the corporate governance of the Company.

**E. Duties Under The Corporate Governance Guidelines**

54. The Company's Amended and Restated Corporate Governance Guidelines (the "Governance Guidelines"), most recently amended April 24, 2024, further define the duties of the Board and its members. The Governance Guidelines provide:

> The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company and its stockholders. In this oversight role, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved for or shared with the stockholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.

55. With respect to director independence, the Governance Guidelines provide that "[t]he Board shall make an affirmative determination at least annually as to the independence of each director," and the Board "is also responsible for determining affirmatively, as to each independent director, that no material relationships exist which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director." In its 2025 Proxy Statement, the Board determined that Defendant Lindberg is **not** independent, and that Defendant Potter is not independent, as set forth more fully above.

56. With respect to related-party transactions, the Governance Guidelines impose the following affirmative reporting obligation on all Board members:

> All members of the Board must inform the Audit and Risk Committee of all types of transactions between them (directly or indirectly) and the Company as soon as reasonably practicable in accordance with the Company's Related Person Transaction Policy. The Audit and Risk Committee will review and, as appropriate, approve all related party transactions in accordance with such policy.

57. With respect to each director's substantive engagement, the Governance Guidelines further provide:

> Each director should be sufficiently familiar with the business and strategies of the Company, including its financial statements and capital structure, and the risks and competition it faces, to facilitate active and effective participation in the deliberations of the Board and of each committee on which such person serves. . . . Directors should also review the materials provided by management and advisors in advance of the meetings of the Board and its committees and should arrive prepared to discuss the issues presented.

58. With respect to each director's loyalty and ethics obligations, the Governance Guidelines provide:

> In their roles as directors, all directors owe a duty of loyalty and care to the Company. In addition, the Company has adopted a Code of Business Conduct and Ethics (the "Code"), which includes a compliance program to enforce the Code, and directors are expected to adhere to the Code.

## V. SUBSTANTIVE ALLEGATIONS

### A. Company Background

59. Grocery Outlet is a growth-oriented extreme value retailer of quality, name-brand consumables and fresh products sold primarily through a network of independently operated stores. Based in Emeryville, California, the Company operates stores across sixteen states. Grocery

Outlet's IOs are small business owners who manage day-to-day operations under the Grocery Outlet brand and generally share approximately 50% of store-level gross profits with the Company. As of January 3, 2026, 529 of the Company's 570 stores were operated by IOs, while the remaining 41 stores (including 39 United Grocery Outlet stores acquired on April 1, 2024) were Company-operated.

60. Central to Grocery Outlet's growth strategy is new store expansion, which the Company has publicly described as a significant driver of long-term stockholder value. However, new stores do not generate profits immediately. The Company has disclosed that it targets first-year profitability as the benchmark for new store performance.

61. Following a challenging fiscal 2023 during which the Company experienced significant disruptions to its ordering, inventory planning and management, and payment processing as a result of its implementation of enterprise resource planning system upgrades in August 2023, and a further challenging fiscal 2024 that the Company described in its 2025 Proxy Statement as "one of the most difficult in the nearly 80 years we have been in business," the Company initiated the Restructuring Plan in the fourth quarter of fiscal 2024. The Restructuring Plan was purportedly intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth, and lower the Company's cost base. The Restructuring Plan included: (i) the termination of twenty-eight (28) leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where the Company had incurred initial costs but leases had not yet been signed; (ii) the cancellation of certain capital-intensive warehouse projects; and (iii) a workforce reduction.

62. On February 25, 2025, the Company filed a Current Report on Form 8-K announcing that it expected to incur total costs under the Restructuring Plan of between $52 million and $61 million, of which between $36 million and $45 million were expected to be cash expenditures. The Company further represented that "[t]he actions under the Restructuring Plan are expected to be substantially completed by the first half of fiscal 2025."

63. For fiscal 2025, the Company issued initial guidance on February 25, 2025 of net sales of $4.7 billion to $4.8 billion; comparable store sales increases of 2% to 3%; gross margin of 30% to 30.5%; adjusted EBITDA of $260 million to $270 million; and adjusted diluted earnings per share of $0.70 to $0.75. The Company represented that it planned to open 33 to 35 net new stores in fiscal 2025.

## B. The Individual Defendants Allow The Company To Issue Materially False And Misleading Statements

### 1. Second Quarter Fiscal 2025

64. On August 5, 2025, after the market closed, the Company filed a Current Report on Form 8-K with the SEC attaching a press release reporting its financial results for the second quarter of fiscal 2025 ended June 28, 2025. The press release represented, among other things:

> Net sales increased by 4.5% to $1.18 billion due to new store sales and a 1.1% increase in comparable store sales. . . . We opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states.

65. The same press release represented that "[t]he actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025," that the Company was "maintaining key guidance figures for fiscal 2025," and that the Company was **raising** its fiscal 2025 adjusted diluted earnings per share guidance from the previously announced $0.70 to $0.75 range to $0.75 to $0.80.

66. On the Q2 fiscal 2025 conference call with financial analysts and investors held later that afternoon, Defendant Potter highlighted the Company's "deliberate steps" to improve performance in its store base:

> We're taking deliberate steps to improve performance across our store base. We're rebalancing store growth towards a healthy mix of core versus new markets, adjusting our internal returns framework, developing more robust site selection criteria and testing several key commercial pilots to drive our performance. . . . As the result of our disciplined underwriting standards and focused execution, we expect returns to steadily improve.

67. Defendant Miller further affirmed the Company's outlook for the year "except for adjusted EPS, which we are increasing due primarily to favorable interest expense."

68. On August 6, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC for the second quarter of fiscal 2025 (the "Q2 FY2025 10-Q"). The Q2 FY2025 10-Q was signed by Defendant Miller and included SOX § 302 certifications signed by Defendants Potter and Miller, each certifying, among other things, that the Q2 FY2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that the Company's disclosure controls and procedures were effective.

**2. Third Quarter Fiscal 2025**

69. On November 4, 2025, after the market closed, the Company filed a Current Report on Form 8-K with the SEC attaching a press release reporting its financial results for the third quarter of fiscal 2025 ended September 27, 2025. The press release represented, among other things:

> Net sales increased by 5.4% to $1.17 billion due to new store sales and a 1.2% increase in comparable store sales. . . . We opened 13 new stores and closed two stores, ending the quarter with 563 stores in 16 states.

70. On the Q3 fiscal 2025 conference call with financial analysts and investors held later that afternoon, Defendant Potter represented:

> In the third quarter, we continue to advance our strategy while executing to deliver strong bottom-line results. We grew net sales 5.4% to $1.17 billion, with sales in comparable stores up 1.2%. . . . In the quarter, we also added 11 net new stores.

71. On November 5, 2025, the Company filed its Quarterly Report on Form 10-Q with the SEC for the third quarter of fiscal 2025 (the "Q3 FY2025 10-Q"). The Q3 FY2025 10-Q was signed by Defendant Miller and included SOX § 302 certifications signed by Defendants Potter and Miller, containing the same certifications described above.

**C. The Company Reports Its 2025 Financial Results Which Misses Guidance**

72. On March 4, 2026, after the market closed, Grocery Outlet filed a Current Report on Form 8-K with the SEC attaching a press release disclosing, among other things, the Company's financial results for the fourth quarter and full fiscal year 2025 ended January 3, 2026. The Company's fiscal 2025 full-year results missed guidance on nearly every major financial metric:

| Metric | Guidance (Low End) | Actual FY2025 Results |
|---|---|---|
| Adjusted EBITDA | $258 million | $254.3 million |
| Net Sales | $4.70 billion | $4.69 billion |
| Comparable Store Sales Growth | 0.6% – 0.9% | 0.5% (52-week basis) |
| Adjusted Diluted EPS | $0.78 | $0.76 |

73. Beyond these misses, the Company disclosed that it was adopting a new "Optimization Plan" on top of the already-announced Restructuring Plan. In connection with the Optimization Plan, the Company disclosed "the closure of 36 financially underperforming stores[,]" $113.8 million of non-cash impairment charges relating to long-lived assets, and $149.0 million of non-cash goodwill impairment. The Company also reported a fiscal 2025 operating loss of $221.7 million and a net loss of $224.9 million, or $(2.30) per diluted share. The Company further estimated that it would incur between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of cash expenditures primarily for lease termination fees, plus between $11 million and $14 million of bad debt expense.

74. During the corresponding March 4, 2026 conference call with financial analysts and investors, Defendant Potter effectively conceded the falsity of the statements alleged herein:

> Following a rigorous analysis of the fleet, we identified 36 stores in the network that we concluded did not have a viable path to sustained profitability regardless of the operational support we could provide. We've made the difficult decision to close 36 locations, 24 of which are located in the East, representing roughly 30% of that region's fleet. . . . However, it's clear now that we expanded too quickly, and these closures are a direct correction.

75. Following the March 4, 2026 disclosures, Grocery Outlet's common stock price fell $2.45, or 27.9%, from a close of $8.79 per share on March 4, 2026 to close at $6.34 per share on March 5, 2026, on unusually heavy trading volume.

**D. Grocery Outlet Is Sued In The Securities Class Action**

76. On March 16, 2026, the Securities Class Action was filed against the Company, Defendant Potter, and Defendant Miller in this Court, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder for materially false and

misleading statements and omissions during the period from August 5, 2025 through March 4, 2026, inclusive. The Securities Class Action seeks substantial damages on behalf of a class of persons and entities that purchased Grocery Outlet common stock during that period. The Company has been and will be required to expend substantial sums to defend against and potentially resolve the Securities Class Action, all as a result of the Individual Defendants' misconduct alleged herein.

**E. The Individual Defendants Cause the Company to Issue a Materially False and Misleading 2025 Proxy Statement**

77. On April 17, 2025, the Company filed its 2025 Proxy Statement with the SEC, soliciting stockholder votes to, among other things: (i) elect three directors — Defendants Jaros, Lindberg, and Potter — to the Board; (ii) approve, on an advisory basis, the Company's named executive officer compensation; (iii) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for fiscal 2025; (iv) approve an amendment to the Company's Restated Certificate of Incorporation to provide stockholders holding a combined 25% or more of the Company's common stock with the right to request a special meeting of stockholders; and (v) approve an amendment to the Company's Restated Certificate of Incorporation to permit the exculpation of officers. The 2025 Proxy Statement was authorized by the Board, whose members at that time included Defendants Bachman, Haben, Jaros, Lindberg, Moody-Byrd, Potter, Ragatz, and York, as well as non-party former directors Kenneth W. Alterman and Thomas F. Herman, and signed by Defendants Lindberg, Ragatz, and Potter.

78. The 2025 Proxy Statement represented that the Board and its Committees were engaged in robust oversight: "Our Board and its Committees have extensive involvement in overseeing the Company's risk management through their activities, some of which are noted below. We believe that the leadership structure of our Board and Committees provides appropriate risk oversight." The Proxy Statement represented that the Board was engaged in general "risk management oversight, including strategic, operational, financial and legal risks[.]"

79. The 2025 Proxy Statement touted the Board's governance principles, representing that the Board maintained "[s]ignificant Board and Committee oversight of strategy, risk, succession planning and ESG." The 2025 Proxy Statement further represented that the Audit Committee oversaw the Company's "approach to enterprise risk management" which is "designed to work across our business to identify, assess, govern and manage risks (including all strategic, operational, compliance and financial risks across the organization."

80. The representations in the 2025 Proxy Statement concerning the Board's risk oversight practices were materially false and misleading and omitted material information. Contrary to those representations, and as more fully set forth in Section IV above, the Individual Defendants were required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

81. On June 6, 2025, Grocery Outlet filed with the SEC a Current Report on Form 8-K announcing, among other things, the election of Defendants Jaros, Lindberg, and Potter to the Board, the approval of executive compensation, the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for fiscal 2025, the approval of the amendment to the Company's Restated Certificate of Incorporation providing stockholders holding a combined 25% or more of the Company's common stock with the right to request a special meeting of stockholders, and the approval of the amendment to the Company's Restated Certificate of Incorporation permitting the exculpation of officers.

## VI. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82. Plaintiff brings this action derivatively and for the benefit of Grocery Outlet to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties and other violations of the securities laws alleged herein.

83. Grocery Outlet is named solely as a nominal party in this action.

84. Plaintiff is, and has been at all relevant times, a stockholder of Grocery Outlet. Plaintiff was a stockholder of the Company at the time of the transactions complained of herein.

85. Plaintiff did not make a demand on the Board to institute this action because such a demand would have been futile. At the time this action was commenced, the Board was comprised of twelve members: (i) Defendant Potter; (ii) Defendant Bachman; (iii) Defendant Haben; (iv) Defendant Jaros; (v) Defendant Kobayashi; (vi) Defendant Lindberg; (vii) Defendant Molloy; (viii) Defendant Moody-Byrd; (ix) Defendant Ragatz; (x) Defendant York; (xi) non-party Frances L. Allen; and (xii) non-party Felicia D. Thornton. Non-parties Allen and Thornton were appointed to the Board only on April 1, 2026 — after the March 4, 2026 corrective disclosure. Accordingly, Plaintiff is only required to show reasonable doubt that at least six members of the twelve-member Board can exercise independent and/or disinterested business judgment about whether to bring this action. As set forth below, demand on the Board is futile as to each of the ten Director Defendants, each of whom faces a substantial likelihood of liability for the claims alleged herein and/or is not independent.

### A. Demand Upon Defendant Potter Is Excused

86. Defendant Potter is not independent. Potter serves as the Company's President and CEO. As an employee of Grocery Outlet, the Company provides Potter with his principal occupation, from which he receives substantial compensation, including $9,501,919 in 2025 alone. Thus, Potter could not consider a demand for action that might require him to sue the directors who control his continued employment and substantial compensation or fellow members of management with whom he works on a day-to-day basis.

87. Potter signed the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and he has a substantial likelihood of liability therefor.

88. Potter benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection on the Grocery Outlet Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

89. Potter is a named defendant in the Securities Class Action and signed each of the SOX § 302 certifications attached to the Q2 FY2025 10-Q and the Q3 FY2025 10-Q, each of which attested to matters that Potter knew or should have known were materially false. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

90. As a director of Grocery Outlet, Potter was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

91. Had Defendant Potter taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

92. For the foregoing reasons, Defendant Potter is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Potter is futile and, thus, excused.

**B. Demand Upon Defendant Lindberg Is Excused**

93. Defendant Lindberg is **not** an independent director under the Nasdaq listing rules, as the Company itself has disclosed in the 2025 Proxy Statement. Lindberg's lack of independence arises from multiple sources:

94. First, Lindberg has substantial, ongoing related-party financial interests in Grocery Outlet. Lindberg or members of his family have material interests in the entities that lease to Grocery Outlet the premises for fourteen (14) of the Company's stores and one (1) distribution center. The Company paid rent to these Lindberg-affiliated landlord entities of approximately $7.4 million in fiscal 2024 and approximately $1.9 million in the thirteen weeks ended March 29, 2025 alone. The leases with Lindberg-affiliated entities expire on various dates through January 2042, giving Lindberg a continuing multi-million-dollar financial stake in the Company's ongoing operations that is distinct from, and potentially in conflict with, the interests of Grocery Outlet's public stockholders.

95. Second, Lindberg served as the Company's CEO at several junctures, including as CEO from January 2019 through December 2022, as Co-CEO from January 2006 through December 2018, and as Interim President and CEO from October 2024 through February 2, 2025. During his tenure, Lindberg oversaw the Company's rapid new store expansion strategy, including the April 1, 2024 acquisition of the 40-store United Grocery Outlet chain — the acquisition that resulted in the $149.0 million non-cash goodwill impairment charge ultimately taken in fiscal 2025. Lindberg continued as Chairman of the Board while the misconduct was ongoing and therefore was directly responsible for the wrongdoing alleged herein.

96. Third, Lindberg is a member of the Read family, the founding family of Grocery Outlet's predecessor. Lindberg is the son-in-law of the Company's former CEO Peter Read (Lindberg married Peter Read's daughter Megan Read). The Company has identified Lindberg in its public filings as the "third generation of Read family leadership" at Grocery Outlet. This multi-generational family relationship gives Lindberg interests that are distinct from the interests of Grocery Outlet's public stockholders, and he cannot be expected to impartially consider a demand

that would require him to sue fellow directors whose continued service supports the Read family's continuing stewardship of the Company.

97. Lindberg additionally signed the 2025 Proxy Statement containing the materially false and misleading representations set forth herein. Lindberg thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and he has a substantial likelihood of liability therefor.

98. Lindberg benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his reelection on the Grocery Outlet Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

99. As a director of Grocery Outlet, Lindberg was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

100. Had Defendant Lindberg taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

101. For the foregoing reasons, Defendant Lindberg is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Lindberg is futile and, thus, excused.

**C. Demand Upon Defendant Ragatz Is Excused**

102. Although Defendant Ragatz has been designated by the Board as "Lead Independent Director," his independence is substantially compromised. Ragatz has served as a

Senior Advisor at Hellman & Friedman LLC since February 2023 and previously served as a Partner of H&F from 2008 through early 2023, leading H&F's efforts to invest in the consumer, retail, and industrial sectors. In 2014, an investment fund affiliated with H&F acquired Grocery Outlet from Berkshire Partners LLC. Ragatz has continuously held his seat on the Board as a representative of the H&F Investor since that transaction. The Company itself has acknowledged in its public filings that its Board leadership structure reflects "the controlling interests held by an investment fund affiliated with H&F." Ragatz's long-standing role as a representative of the H&F Investor — and his continuing advisory role at H&F —precludes him from considering a demand that would require him to sue fellow directors, particularly fellow H&F-connected board members whose continued service serves the interests of the H&F Investor.

103. Ragatz's independence is further compromised by his concurrent service on the boards of multiple other H&F portfolio companies, from which he receives additional compensation and professional standing that depend upon his continued good standing with H&F. Specifically, Ragatz concurrently serves as Chairman of the Board of At Home Group, Inc. (an H&F portfolio home décor retailer); Chairman of the Board of The New Leaf Company BV, doing business as Superplum (an H&F portfolio fresh produce supply company whose product offering overlaps with Grocery Outlet's own fresh products segment); and a director of And Go Concepts, LLC, doing business as Salad&GO. From August 2017 to June 2024, Ragatz additionally served as Chairman of the Board of Snap One Holdings Corp., another H&F portfolio company. Ragatz's simultaneous chairmanships of the Superplum and At Home Group boards, and his directorship of Salad&GO, directly implicate Ragatz's divided loyalties: Superplum is a supplier in the same fresh produce segment in which Grocery Outlet competes, and Ragatz has a direct fiduciary obligation to both companies simultaneously. Ragatz's compensation and professional standing across this portfolio precludes him from considering a demand with the required independence and disinterest that would require him to take action adverse to the interests of the H&F Investor or his fellow H&F-connected board members.

104. Ragatz signed the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and he has a substantial likelihood of liability therefor.

105. As a member of the Compensation Committee and Nominating and Corporate Governance Committee, Ragatz had direct oversight responsibilities over, among other things, executive compensation (which was awarded based on Company performance that was artificially inflated by the misleading statements), the Company's corporate governance practices, the Company's environmental, social and governance practices, and the oversight of risks associated with the independence of the Board. Ragatz utterly failed to perform these essential duties.

106. As a director of Grocery Outlet, Ragatz was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

107. Had Defendant Ragatz taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

108. For the foregoing reasons, Defendant Ragatz is neither disinterested nor independent, and he faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Ragatz is futile and, thus, excused.

**D. Demand Upon Defendant Bachman Is Excused**

109. Bachman authorized the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and he has a substantial likelihood of liability therefor.

110. Bachman additionally concurrently serves on the Board of Directors of GOJO Industries, Inc., the maker of PURELL brand hand sanitizer and a private Ohio-based consumer products company, where Defendant Jaros serves as President and CEO. Bachman holds his GOJO board seat at the discretion of Jaros in her capacity as the CEO of GOJO. As a result, Bachman cannot independently and disinterestedly consider a demand that would require him to sue Jaros, because doing so would jeopardize his own directorship at GOJO and the compensation and professional standing associated therewith.

111. As Chair of the Audit Committee, Bachman had primary oversight responsibility for the Company's financial reporting, internal controls over financial reporting, and enterprise risk management. The Audit Committee Charter tasked Bachman and the Audit Committee with reviewing and discussing with management each of the Company's earnings releases and interim financial statements, including the Q2 FY2025 and Q3 FY2025 earnings releases and Forms 10-Q. Bachman utterly failed to perform these essential duties.

112. As a director of Grocery Outlet, Bachman was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

113. Had Defendant Bachman taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

114. For the foregoing reasons, Defendant Bachman is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Bachman is futile and, thus, excused.

**E. Demand Upon Defendant Haben Is Excused**

115. Haben authorized the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and she has a substantial likelihood of liability therefor.

116. As Chair of the Nominating and Corporate Governance Committee, Haben had primary oversight responsibility for, among other things, the Company's corporate governance practices, the Company's environmental, social and governance practices, and the oversight of risks associated with the independence of the Board. Haben utterly failed to perform these essential duties.

117. As a director of Grocery Outlet, Haben was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

118. Had Defendant Haben taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

119. For the foregoing reasons, Defendant Haben is neither disinterested nor independent, and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Haben is futile and, thus, excused.

**F. Demand Upon Defendant Jaros Is Excused**

120. Jaros authorized the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and she has a substantial likelihood of liability therefor.

121. Jaros benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing her reelection on the Grocery Outlet Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

122. Jaros's lack of independence is further compounded by her professional relationship with Defendant Bachman. Jaros serves as President and CEO of GOJO, and Bachman concurrently serves on GOJO's Board of Directors. As Bachman's fellow board member and as the CEO to whom Bachman is accountable at GOJO, Jaros cannot independently and disinterestedly consider a demand that would require her to sue Bachman at Grocery Outlet, because doing so would irreparably damage the working relationship on which her own tenure as GOJO's CEO materially depends.

123. As a member (and, after August 7, 2025, Chair) of the Compensation Committee, Jaros was responsible for oversight of the Company's executive compensation, which was awarded based on Company performance that was artificially inflated by the misleading statements. Jaros utterly failed to perform these essential duties.

124. As a director of Grocery Outlet, Jaros was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with

all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

125. Had Defendant Jaros taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

126. For the foregoing reasons, Defendant Jaros is neither disinterested nor independent, and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Jaros is futile and, thus, excused.

**G. Demand Upon Defendant Kobayashi Is Excused**

127. As a member of the Audit Committee, Kobayashi had direct oversight responsibilities over the Company's financial reporting, internal controls over financial reporting, and enterprise risk management, including with respect to the materially false and misleading Q3 fiscal 2025 earnings release, conference call, and Q3 FY2025 10-Q. Kobayashi utterly failed to perform these essential duties.

128. As a director of Grocery Outlet, Kobayashi was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

129. Had Defendant Kobayashi taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

130. For the foregoing reasons, Defendant Kobayashi is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Kobayashi is futile and, thus, excused.

**H. Demand Upon Defendant Molloy Is Excused**

131. As a member of the Audit Committee, Molloy had direct oversight responsibilities over the Company's financial reporting, internal controls over financial reporting, and enterprise risk management, including with respect to the materially false and misleading Q3 fiscal 2025 earnings release, conference call, and Q3 FY2025 10-Q. Molloy utterly failed to perform these essential duties.

132. As a director of Grocery Outlet, Molloy was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

133. Had Defendant Molloy taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

134. For the foregoing reasons, Defendant Molloy is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Molloy is futile and, thus, excused.

### I. Demand Upon Defendant Moody-Byrd Is Excused

135. Moody-Byrd authorized the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and she has a substantial likelihood of liability therefor.

136. As a member of the Audit Committee, Moody-Byrd had direct oversight responsibilities over the Company's financial reporting, internal controls over financial reporting, and enterprise risk management, including with respect to the materially false and misleading Q2 fiscal 2025 and Q3 fiscal 2025 earnings releases, conference calls, and Forms 10-Q. Moody-Byrd utterly failed to perform these essential duties.

137. Had Defendant Moody-Byrd taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

138. As a director of Grocery Outlet, Moody-Byrd was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

139. For the foregoing reasons, Defendant Moody-Byrd is neither disinterested nor independent, and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Moody-Byrd is futile and, thus, excused.

**J. Demand Upon Defendant York Is Excused**

140. York authorized the 2025 Proxy Statement containing the materially false and misleading representations set forth herein and thereby faces a substantial likelihood of liability for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, and he has a substantial likelihood of liability therefor.

141. York's independence is further compromised by his long-standing ties to Sobeys—Defendant Potter's former employer of approximately twenty-eight years, where Potter held successively senior operational and leadership positions from 1990 through June 2018, including as Executive Vice President of Operations. Specifically, from June 2020 through January 2025 — with York's tenure ending the same month Potter was appointed CEO of Grocery Outlet on January 17, 2025 (effective February 3, 2025) — York served as Special Advisor to Sobeys Inc. In addition, from November 2009 through June 2020, York served as Co-CEO and President of Farm Boy, Inc., a Canadian specialty grocery retailer that was acquired in 2018 for approximately $800 million by Sobeys' parent company Empire Co. Ltd. York's longstanding professional relationship with Sobeys — the Canadian grocery conglomerate within which Potter spent the formative years of his grocery career — compromises York's ability to consider a demand to take action against Potter with the required independence and disinterest.

142. As a member of the Audit Committee, York had direct oversight responsibilities over the Company's financial reporting, internal controls over financial reporting, and enterprise risk management, including with respect to the materially false and misleading Q2 fiscal 2025 and Q3 fiscal 2025 earnings releases, conference calls, and Forms 10-Q. York has served as a director of Grocery Outlet since November 2010 — the longest continuous tenure of any non-Read-family director — and has had ample opportunity over the course of his more than fifteen-year tenure to understand the Company's business and to question its management; his continued oversight failures therefore cannot be attributed to unfamiliarity with the business. York utterly failed to perform these essential duties.

143. As a director of Grocery Outlet, York was required but failed to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

144. Had Defendant York taken timely action to correct the materially false and misleading statements described herein, the damage caused to Grocery Outlet could have been prevented or at least minimized.

145. For the foregoing reasons, Defendant York is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant York is futile and, thus, excused.

### K. Other Factors Demonstrating That Demand Upon the Grocery Outlet Board Is Excused

146. Grocery Outlet has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

147. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. For fiscal 2024, each non-employee director received an annual cash retainer of $75,000, with additional cash retainers of $25,000 for the Audit Committee Chair, $25,000 for the Compensation Committee Chair, $20,000 for the Nominating and Corporate Governance Committee Chair, $15,000 for each Audit Committee member, $10,000 for each Compensation Committee member, and $10,000 for each Nominating and Corporate Governance Committee member. The Chairman of the Board (Lindberg) received an additional annual cash retainer of $150,000 for such service,

and the Lead Independent Director (Ragatz) received an additional annual cash retainer of $50,000. In addition, each non-employee director receives an annual equity award. The Director Defendants have thus benefited from the wrongs herein alleged and have engaged themselves in self-dealing.

148. Publicly traded companies, such as Grocery Outlet, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within the scope of this Complaint — particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

149. The acts complained of herein constitute violations of fiduciary duties owed by Grocery Outlet's officers and directors, and these acts are incapable of ratification.

150. The Board has failed to take any remedial action to address the wrongdoing alleged herein. The Board has not terminated any officer for the misconduct alleged herein; the Board has not formed a special committee to investigate the misconduct; the Board has not implemented meaningful internal control reforms; and the Board has not taken any action to recover the Company's damages from the Individual Defendants.

## VII. CLAIMS FOR RELIEF

**COUNT ONE**
**(Violations of Section 14(a) of the Exchange Act**
**Against Defendants Bachman, Haben, Jaros, Lindberg, Moody-Byrd, Potter, Ragatz, and York)**

151. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff

specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to this non-fraud claim.

153. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides, among other things, that it shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any registered security in contravention of such rules and regulations as the SEC may prescribe.

154. Rule 14a-9, promulgated by the SEC under Section 14(a) of the Exchange Act, provides that no proxy statement shall contain any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

155. Under the direction of Defendants Bachman, Haben, Jaros, Lindberg, Moody-Byrd, Potter, Ragatz, and York, the 2025 Proxy Statement failed to disclose that the Individual Defendants each breached their fiduciary duties to Grocery Outlet and its stockholders by, among other things, failing to: (i) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Grocery Outlet's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's new store growth strategy, the sustainability of its rapid store expansion, and the Company's ability to meet its 2025 financial guidance; (ii) effectively oversee and monitor the material risks facing the Company; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

156. In the exercise of reasonable care, Defendants Bachman, Haben, Jaros, Lindberg, Moody-Byrd, Potter, Ragatz, and York should have known that by misrepresenting or failing to

disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading and omitted material information.

157. The false and misleading statements in, and information omitted from, the 2025 Proxy Statements were material to Grocery Outlet's shareholders in determining whether to, among other things, (i) elect three directors — Defendants Jaros, Lindberg, and Potter — to the Board; (ii) approve, on an advisory basis, the Company's named executive officer compensation; (iii) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for fiscal 2025; (iv) approve an amendment to the Company's Restated Certificate of Incorporation to provide stockholders holding a combined 25% or more of the Company's common stock with the right to request a special meeting of stockholders; and (v) approve an amendment to the Company's Restated Certificate of Incorporation to permit the exculpation of officers.

158. The material misstatements and omissions in the 2025 Proxy Statement damaged the Company.

159. Plaintiff, on behalf of Grocery Outlet, seeks relief for damages inflicted upon the Company based on the misleading 2025 Proxy Statement in connection with the improper election of Defendants Jaros, Lindberg, and Potter to the Board, the approval of executive compensation, the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for fiscal 2025, the approval of the amendment to the Company's Restated Certificate of Incorporation providing stockholders holding a combined 25% or more of the Company's common stock with the right to request a special meeting of stockholders, and the approval of the amendment to the Company's Restated Certificate of Incorporation permitting the exculpation of officers.

**COUNT TWO**
**(Contribution Under Section 21D of the Exchange Act Against The Individual Defendants)**

160. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161. The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

162. Grocery Outlet is named as a defendant in a related Securities Class Action that alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Grocery Outlet is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

163. As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Grocery Outlet's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

164. The Individual Defendants are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

165. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT THREE**
**(Breach of Fiduciary Duty**
**Against The Individual Defendants)**

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. The Individual Defendants each owed Grocery Outlet and its stockholders fiduciary duties of loyalty, good faith, due care, and candor. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been

discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Grocery Outlet alleged herein.

168. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

169. The Individual Defendants each breached their fiduciary duties to Grocery Outlet and its stockholders by, among other things, failing to: (i) implement and maintain an effective system of internal controls over the Company‘s financial reporting and public disclosures, including ensuring that the Company was complying with all laws, rules, and regulations governing Grocery Outlet‘s core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company‘s new store growth strategy, the sustainability of its rapid store expansion, and its ability to meet financial guidance; (ii) effectively oversee and monitor the material risks facing the Company, including the risks associated with the Company‘s rapid new store expansion and the adequacy of the Restructuring Plan; and (iii) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

170. The Individual Defendants further breached their fiduciary duties to Grocery Outlet by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

171. As a direct and proximate result of the Individual Defendants‘ breaches of their fiduciary obligations, Grocery Outlet has sustained and continues to sustain significant damages, including without limitation: (i) the costs of defending and potentially resolving the Securities Class Action; (ii) reputational damage with customers, vendors, lenders, and investors; (iii) destruction of stockholder value, as evidenced by the 27.9% stock price decline following the March 4, 2026 corrective disclosure; (iv) the $113.8 million in non-cash long-lived asset impairment charges and $149.0 million in non-cash goodwill impairment charges taken in fiscal

2025; and (v) the Company's inability to efficiently raise capital on the terms it would have otherwise obtained absent the misconduct alleged herein.

172. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT FOUR**
**(Aiding and Abetting Breach of Fiduciary Duty Against The Individual Defendants)**

173. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174. Each of the Individual Defendants has acted and is acting with knowledge of, or with reckless or grossly negligent disregard to the fact that, the Individual Defendants are in breach of their fiduciary duties to Grocery Outlet and have participated in such breaches of duties.

175. In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct, and has acted in concert with and conspired with one another in furtherance of their wrongdoing. Each of the Individual Defendants substantially assisted the others in committing the breaches of fiduciary duties described herein.

176. As a direct and proximate result of the Individual Defendants' wrongful conduct, Grocery Outlet has sustained and continues to sustain significant damages.

**COUNT FIVE**
**(Unjust Enrichment Against The Individual Defendants)**

177. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

178. By their wrongful acts and omissions alleged herein, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Grocery Outlet. The Individual Defendants were unjustly enriched through, among other things, the receipt of compensation, director remuneration, and other benefits and emoluments from Grocery Outlet while they were breaching their fiduciary duties owed to Grocery Outlet and its stockholders.

179. It would be unconscionable to allow the Individual Defendants to retain the unwarranted benefits described above. Plaintiff, on behalf of Grocery Outlet, seeks restitution from the Individual Defendants in the amount of the compensation, director remuneration, and other benefits received while they were breaching their fiduciary duties to the Company.

180. Plaintiff, on behalf of Grocery Outlet, has no adequate remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Grocery Outlet and against the Individual Defendants, as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Grocery Outlet and that demand on the Board is excused;

B. Declaring that the Individual Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, have breached their fiduciary duties to Grocery Outlet, have aided and abetted one another‘s breaches of fiduciary duties, have been unjustly enriched, and are liable to Grocery Outlet for contribution under Section 21D of the Exchange Act;

C. Determining and awarding to Grocery Outlet the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D. Directing Grocery Outlet and the Individual Defendants to take all necessary actions to reform and improve Grocery Outlet‘s corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the wrongdoing described herein, including, but not limited to, putting forward for stockholder vote appropriate resolutions for amendments to the Company‘s Bylaws or Certificate of Incorporation and taking such other actions as may be necessary to place before stockholders proposals for improved corporate governance;

E. Awarding to Grocery Outlet restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation

obtained by the Individual Defendants as a result of their wrongful conduct and breaches of fiduciary duty;

F. Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys‘ fees, accountants‘ and experts‘ fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

## IX. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 15, 2026

**WEISS LAW**

By: */s/ Joel E. Elkins*
Joel E. Elkins
1801 Century Park East, 24th Floor
Los Angeles, CA 90067
Telephone: 310/208-2800
Facsimile: 310/209-2348

*Attorneys for Plaintiff ES Trust*

**OF COUNSEL:**

**WEISS LAW**
David C. Katz
Mark D. Smilow
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

Joshua M. Rubin
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com

# VERIFICATION

I, Sarah Malowitzky, on behalf of the ES Trust (the "Trust"), hereby verify that the Trust is a stockholder of Grocery Outlet, Inc. ("Grocery Outlet"), having first acquired Grocery Outlet shares in November 2025 and having held Grocery Outlet shares continuously at all relevant times herein. I, on behalf of the Trust, am ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of Grocery Outlet. I have reviewed the allegations in the attached Verified Stockholder Derivative Complaint (the "Complaint"), and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the Complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of the Trust.

Dated: May 13, 2026

Sarah Malowitzky

Sarah Malowitzky, Trustee
ES Trust